BEATRICE O. ANTHONY, Plaintiff, *v.* SYRACUSE UNIVERSITY, Defendant.

Supreme Court, Onondaga County, August 17, 1927.

Colleges — students — action to compel reinstatement of plaintiff as student of Syracuse University — University is quasi-public — plaintiff was dismissed at beginning of fourth year without assigned reason — courts have power to review action of University — University cannot arbitrarily dismiss student — regulation, printed on registration card, authorizing summary dismissal is void as against public policy — if regulation were valid plaintiff was not bound by signing registration card — fact that said regulation is void does not avoid entire contract — plaintiff reinstated.

This is an action to reinstate the plaintiff as a student in Syracuse University. The plaintiff was summarily dismissed at the commencement of her fourth year without any reason being assigned for her dismissal, and, furthermore, the defendant refused, on request, to give any reason for her dismissal, relying upon a rule of the University that it might dismiss any student at any time without an assigned reason. Syracuse University, while not a public college, is, in view of the fact that it is subject to the jurisdiction of the Regents of the University of the State of New York, impressed with a public interest, and its action in dis-

Supreme Court, August, 1927.                    [Vol. 130

missing a student arbitrarily and without an assigned reason may be reviewed by the courts.

The relationship of the plaintiff to the defendant was contractual, and while the defendant has a large discretion in expelling students, it cannot do so arbitrarily and without reason.

A rule of the University which appears in its catalogue providing that attendance at the University is a privilege and not a right, and that the University reserves the right to request the withdrawal of any student whose presence is deemed detrimental without assigning any reason for expulsion, is void on the ground that it is arbitrary and against public policy. Such a rule deprives the contractual relationship of the essential element of mutuality.

The University did not have the right to dismiss the plaintiff arbitrarily and without assigned reason, although she signed a registration card purporting to give her acceptance to the rule stated.

If the contract as interpreted by the University could be held to be valid, the rule of constructive knowledge does not apply, for it is apparent that the plaintiff signed the registration card as a matter of course without any actual knowledge or appreciation of its legal effect or its consequences, but in the full belief that the University would not require its students to abide by unreasonable rules.

The fact that this particular rule is held to be void does not avoid the entire contract, for the rule in question was not of the essence of the contract and its invalidity does not defeat the duty on the part of the defendant to conform to its contract to give the plaintiff the benefit of its educational advantages so long as she shall comply with the reasonable rules of the University, and finally to award her a degree in testimony that she has completed her course of instruction.

The plaintiff is granted a judgment directing her reinstatement in Syracuse University.

ACTION for reinstatement of the plaintiff as a member of the class in domestic science or home economics and as a student in Syracuse University.

*Hitchcock, Murphy & Mawhinney,* for the plaintiff.

*Williams & Cowie,* for the defendant.

SMITH, J. The defendant Syracuse University is a corporation organized and existing under and pursuant to the terms of a special charter granted by chapter 414 of the Laws of 1887, entitled " An act for the reorganization and incorporation of the Syracuse University." It is an educational institution having for its object " the diffusion of knowledge, and to promote Christian learning, literature, science and art, in their various departments, and the knowledge of the learned professions." It is authorized to create colleges of medicine, of theology, of liberal arts, of law, of industrial arts, of fine arts, of letters, " and such other colleges or departments as said trustees shall deem expedient or necessary to accomplish the purposes of said university." It may prescribe rules and regulations for the government of said colleges; it is governed by a board of trustees who are authorized " for the purpose of carrying into effect the provisions of this act, to make and establish all such

rules and ordinances, as to them shall seem expedient or necessary, for carrying into effect the purposes of said corporation, not inconsistent with the Constitution and laws of this State or of the United States;" it is subject to the visitation of the Regents of the University of the State of New York " in the same manner and to the same extent as the various colleges of this State."

From small beginnings Syracuse University has grown and prospered until it has become one of the great institutions of learning within the State, undertaking in its various departments the education, culture or mental training of thousands of students of both sexes; it is an eleemosynary institution and, as such, is exempt from taxation; it is supported in part by tuitions or dues paid by students and in part by the interest on endowment funds and contributions of those interested in the education of the youth of the land.

It is peculiarly true, in this Republic, which depends for its endurance as a free government upon the education and intelligence of its citizens, that the subject of education has been, is, and of necessity must continue to be a matter of the highest public concern.

While it is true that the defendant is not a State institution and is not supported directly by taxation, still, receiving its charter by special grant from the State, exempt from taxation, subject to the visitation of the Regents of the University of the State of New York, endowed with certain important powers in conferring degrees, dealing with the youth of the State in large numbers, with the power during attendance at the University to regulate their conduct and their courses of study in preparation for their several careers in life, it would be absurd to say that such an institution does not at least take on the quality of a quasi-public character so as to be affected by considerations of public policy.

It would be valuable here to trace the development of the educational system of the State of New York from the time of the creation of the corporation known as " The Regents of the University of the State of New York," but this would involve too extensive a statement; suffice it to say that under the peculiar educational system of the State of New York all colleges and universities therein which are created by or by their charters are made subject to the visitation of said Regents in a way form constituent parts of the educational system of the State under the corporation known as " The Regents of the University of the State of New York." That this power of visitation is no idle one is shown by the provisions of the Education Law of the State, and particularly at sections 62, 63 and 68 thereof; it is evidenced in the case of *People ex rel. Diffenbach* v. *Regents of University*

(199 App. Div. 55). The provision of the State Constitution continuing the said corporation (N. Y. Const. art. IX, § 2) and the development of the educational policy as set forth in the Education Law and the extent of the power of visitation are sufficient of authority for the proposition that a university existing subject to the visitation of the Regents, while it does have the qualities of a private corporation, still, as a constituent part of the educational system of the State, is impressed with a deep public interest.

It was to this institution that the plaintiff, a young lady of seventeen or eighteen years of age, came in September, 1923, at the beginning of the fall term of the University, seeking admission as a student with the purpose of pursuing a course of study and training in domestic science or home economics, which, if successfully pursued for a period of four years, would have resulted in her graduation in the class of 1927 with the degree of bachelor of science, qualified to discharge the duties of an instructress in domestic science or home economics in any educational institution of the State of New York. She matriculated with the class of 1927 and entered upon the pursuit of her studies, paying the required tuition each year down to and including the fall term of 1926; after the summer vacation and on or about September 15, 1926, she returned to the University for the purpose of continuing the pursuit of such course, paid her tuition and entered upon the studies for the year. On or about the 6th day of October, 1926, she was by said University, through its duly constituted officers, peremptorily dismissed from the University for no cause stated and after refusal by it, upon demand by the plaintiff, to state the reasons for such dismissal. No statement of the grounds of dismissal was made and no opportunity to answer any charge of misconduct or delinquency warranting dismissal was given, but the plaintiff was arbitrarily dismissed under a claimed right or authority on the part of the defendant to make such dismissal without notice and without stating reasons. The shock caused by the peremptory dismissal was severe and resulted in her confinement in the infirmary of the University for about a week.

This action is brought by the plaintiff for a judgment of this court directing the defendant to reinstate her as a student in the department or college of such University of which she was a member, with the same force and effect, so far as may be, as if she had never been dismissed.

Both parties agree that when a student becomes duly matriculated in a college or university a contractual relationship arises: on the one hand, the student, having paid the tuition, agrees to

abide by the rules and regulations of the college or university; he must accept the course of study prescribed; if he would remain he must meet the tests required as to attendance, as to diligence in study and as to personal conduct; failure on his part in any of these respects empowers the university or college to impose penalties or punishments prescribed, and in some cases authorizes dismissal; on the other hand, the university or college agrees that, in the event the student successfully pursues the course of study prescribed and complies during his attendance at the institution with the disciplinary rules and regulations of it, he will receive evidence of his conduct and proficiency in the form of a certificate or diploma. In an institution like Syracuse University, certain of these diplomas are evidences of qualification for certain pursuits in life. Such is the contract.

The relationship created amounts to this and more; it means the establishment of associations, the acquisition of friendships, the enjoyment of experiences which become endowments of great value to the student in subsequent life — values which are very great and which cannot be measured in dollars. The selection of one's institution of learning is always a matter of deep consideration and care on the part of the parents and of the youth; it is usually made with regard to the prospective student's career in life; once made and followed by long attendance, it cannot without serious loss be changed, and dismissal is pregnant with consequences which may spell the ruination of a life.

In the instant case these values have now been lost to the plaintiff by the defendant's act of dismissal. These usual consequences may or may not have followed in the instant case, according to the circumstances and purposes of the plaintiff.

The foregoing are some of the reasons which lie behind the rulings of the courts that the relationship between a student and a university or college is a contractual one. A few citations of authorities will suffice: (27 R. C. L. 144; *People ex rel. Cecil* v. *Bellevue Hospital*, 60 Hun, 107; affd., 128 N. Y. 621; *Goldstein* v. *New York University*, 76 App. Div. 80; 11 Corpus Juris, 984, 997.)

In 27 Rul'ng Case Law (*supra*) the law is well stated as follows: " One who is admitted to a college and pays the fees for the first year's instruction has a contract right to be permitted to continue as a student until he, in regular course, attains the diploma and degree which he seeks, and which the institution is authorized to confer, and he cannot be arbitrarily dismissed. * * * While admitted students are at liberty to terminate all relations at any time, it does not follow that the college or university has the same right. In fact, when one is admitted to a college, there is an

Supreme Court, August, 1927.          [Vol. 130

implied understanding that he shall not be arbitrarily dismissed therefrom. * * * It is clear that the fees for the first year are, in fact, paid and received with the understanding that the work of the year will not be made fruitless, a graduation and degree made impossible, by an arbitrary refusal to permit further attendance. In this understanding there is no want of mutuality. There is no want of good and valuable consideration. * * * An action for breach of contract is not an adequate remedy for such wrongful expulsion depriving the student of the opportunity of obtaining a diploma and degree to which, under his contract, he is entitled, and mandamus will lie to compel his reinstatement."

In *People ex rel. Cecil* v. *Bellevue Hospital (supra)* the relator entered said college " for the purpose of taking the regular course of study in that institution and procuring the degree of Doctor of Medicine. At the end of such course, and having fulfilled all the conditions entitling him to present himself for final examination, he was informed by the secretary of the faculty that he would not be allowed to present himself for final examination, nor would said corporation grant him the degree of Doctor of Medicine.

" In answer to this application the respondent presents no ground whatever for its action, but insists that it has the right arbitrarily, without any cause, to refuse the relator his examination and degree.

" It seems to us clear that such a position cannot for a moment be entertained. The circulars of the respondent indicate the terms upon which students will be received, and the rights which they were to acquire by reason of their compliance with the rules and regulations of the college in respect to qualifications, conduct, etc. When a student matriculates under such circumstances, it is a contract between the college and himself that if he complies with the terms therein prescribed he shall have the degree, which is the end to be obtained. This corporation cannot take the money of a student, allow him to remain and waste his time (because it would be a waste of time if he cannot get a degree), and then arbitrarily refuse, when he has completed his term of study, to confer upon him that which they have promised, namely, the degree of Doctor of Medicine which authorizes him to practice that so-called science.

" It may be true that this court will not review the discretion of the corporation in the refusal, for any reason or cause, to permit a student to be examined and receive a degree; but where there is an absolute and arbitrary refusal, there is no exercise of discretion. It is nothing but a willful violation of the duties which they have assumed.

" Such a position could never receive the sanction of a court in which even the semblance of justice was attempted to be administered."

In *Goldstein* v. *New York University (supra)* it is stated: " The relation existing between the university and a matriculated student thereof is contractual, and the law will protect the student against an unauthorized or unjustified expulsion.  The contract between the student and the university contains an implied condition that the student will not be guilty of such misconduct as will be subversive of the discipline of the university, or as will show him to be morally unfit to be continued as a member thereof.  *  *  * The power of suspension or expulsion of students is an attribute of government of educational institutions."

Sufficient authorities have been cited to show not only that the relationship between a student and a university is contractual, but also that the action of a university or college in arbitrarily dismissing a student is subject to review by the courts.  It is obvious that the courts are loath to interfere with the exercise of discretion by the governing body of an institution of learning upon an established state of facts; wide latitude, indeed, of necessity, must be given; but that is far from saying that arbitrary action, or action motivated by prejudice or false information ought to be tolerated.

A recent statement is contained in 11 Corpus Juris (p. 984) where, at section 9 of the heading " Colleges and Universities," it states as follows: " A college cannot arbitrarily and without cause refuse examination and degree to a student who has complied with all the conditions entitling him thereto,  *  *  *.  The decision of the college authorities is conclusive on the question as to whether a student has performed the conditions entitling him to a degree, if they act in good faith and within their jurisdiction. The exercise of a discretionary power to withhold a degree will not be interfered with by the court in the absence of bad faith or clear abuse.  *  *  *  Where the right to a degree is clear, mandamus lies to enforce it."

Again (at p. 997): " The proper authorities of a college or university may make reasonable rules and regulations for the government and discipline of the students, *so long as they do not interfere with some positive right;  *  *  *  and unless such rules and regulations are found to be unauthorized, against common right, or palpably unreasonable, the courts will not annul or revise them.  *  *  * A college cannot dismiss a student except on a hearing in accordance with a lawful form of procedure, giving him notice of the charge and an opportunity to hear the testimony against him, to question witnesses,*

*and to rebut the evidence. A student wrongfully dismissed is entitled to reinstatement since an action for breach of contract would not afford adequate relief.*"

So far as infants are concerned, university and college authorities " stand *in loco parentis* concerning the physical and moral welfare and mental training of the pupils, and to that end they may make any rule or regulation for the government or betterment of their pupils that a parent could for the same purpose. Whether the rules or regulations are wise or their aims worthy is a matter left solely to the discretion of the authorities, and in the exercise of that discretion the courts are not disposed to interfere *unless the rules and aims are unlawful or against public policy.*" (27 R. C. L. 141.)

Contracts which are unenforcible because against public policy have been well defined as follows: " Contracts are against public policy when they tend to injustice or oppression, restraint of liberty, and natural or legal right, or to the obstruction of justice." (6 R. C. L. 713.)

Contracts of the character here under consideration are, in a way, *sui generis*, and principles of law applicable to the interpretation of their provisions should find their expression in the light of the peculiar nature of the circumstances of their making and of the relationships created. Arising as such contracts do out of the fact of matriculation under the rules and regulations of the college or university, and entered into in many if not most instances by infants, the reasonableness of the provisions thereof, as expressed in rules and regulations, and of the enforcement of such rules and regulations where the opportunity for arbitrary action exists and where sound public policy may be offended, is clearly a subject for the consideration of the courts.

It is apparent that, according to the foregoing expression of principles governing the relationship between a university or college and its students, under the circumstances of the instant case in so far as they have up to this time been stated, the court has not only the power but it would be its duty, in view of the arbitrary character of the act of dismissal, to decree a reinstatement of the plaintiff.

The defendant here, while recognizing the existence of the contractual relationship, seeks to sustain its position by reason of a rule or regulation set forth in its various catalogues and in force during the period under consideration, as follows:

In the catalogue for 1922–1923 (at p. 47): " Attendance at the University is a privilege and not a right. In order to safeguard its scholarship and its moral atmosphere, the University reserves

the right to request the withdrawal of any student whose presence is deemed detrimental. Specific charges may or may not accompany a request for withdrawal."

In the catalogue for the years 1923–1924 (at p. 25); for 1924–1925 (at p. 61) and for 1925–1926 (at p. 67) there is, in place of the foregoing, the following modified form thereof: " Attendance at the University is a privilege and not a right. In order to safeguard those ideals of scholarship and that moral atmosphere which are in the very purpose of its foundation and maintenance, the University reserves the right and the student concedes to the University the right to require the withdrawal of any student at any time for any reason deemed sufficient to it, and no reason for requiring such withdrawal need be given."

Upon matriculating, students sign so-called " registration cards," and in pursuance of this course this plaintiff did, upon admission to the University, sign a registration card which provides as follows: " I agree in honor to comply with the regulations and requirements of Syracuse University and to cooperate with the University authorities and my fellow students in maintaining high standards of conduct and scholarship and in promoting the general welfare of the University. It is understood that I accept registration as a student in Syracuse University subject to the rule as to continuance therein found on page 47 of the University Catalogue."

Similar registration cards were signed by the plaintiff upon her entrance upon the school years of 1924–1925, 1925–1926 and 1926–1927, and it must be held, whatever may be its effect, that the clause above quoted was a rule or regulation to which the plaintiff subscribed when she entered Syracuse University, and, if it be a lawful and binding provision of the contract, that the plaintiff is without remedy here. The fact that the plaintiff had no actual knowledge of the existence of this rule would not alter the situation, assuming that the rule of constructive knowledge be under the circumstances applicable.

The clause " Attendance at the University is a privilege and not a right " is indeed illuminating, because its clear intent and effect is to determine by act of the University that the relationship existing between it and its students is not a contractual one; for it is clear that if continued attendance at the University is a privilege and not a right, then no such contractual relationship as that with which we have been dealing and which so many times has been the subject of consideration by the courts exists; and, no matter what the consequences may be upon the life of an individual, if this be a valid provision, Syracuse University has by its own

17

declaration placed itself outside the realm of law of contracts. No student has a right of admission to the University in the first instance. The University clearly has a right to refuse matriculation to any applicant for admission. But this rule relates to attendance after admission.

The essence of the arrangement made between this plaintiff and this defendant is that upon the payment of tuition, compliance with the regulations and completion of the prescribed course of study, the plaintiff will become entitled to a degree proper for the course of study which she pursues. Such is the contract; here there is mutuality. The effect of the clause under consideration is to destroy all contractual relations and to place this university in the peculiar position of being, in respect of relations between itself and its students, without the pale of the law of contracts. No such situation can be tolerated. This statement in the rule is ineffective and void, in so far as it attempts to avoid the contractual relationship which admittedly did arise between this university and this plaintiff. It is of no force, because its effect would be to defeat the contract; it is repugnant to its very terms, and is lacking in every element of that essential of every contract — mutuality. This attempt to take on the character of a purely private institution, run for profit, is a nullity in so far as it affects a student duly matriculated. Sound public policy is offended by this part of the rule. The defendant becomes thus subject to the rules of law against arbitrary dismissal.

The purpose of the rule authorizing dismissal without assignment of reason is clearly stated in the rule itself; it is " to safeguard those ideals of scholarship and that moral atmosphere which are in the very purpose of its [the University's] foundation and maintenance." The obvious effect of this rule is to reserve to this institution the arbitrary power not only to destroy the career of a student but also to injure his reputation, not by reason of anything which he may have done, but by the very act of the University itself, because the purpose of a dismissal under the rule is " to safeguard those ideals of scholarship and that moral atmosphere," etc. No arbitrary act can be taken under this provision which by force of the declared purpose does not cast a blight upon the reputation as to ideals of scholarship or as to moral standing, or both, of that student against whom its provisions are invoked. The right to one's life, to develop one's character, to have one's reputation free from smirching by the acts of others, is inherent and of the most valuable of rights; no institution by its own act can endow itself with the power to impair, by indirection, by innuendo or by implication, the reputation of any individual.

Misc. 249]                    Supreme Court, August, 1927.

The Legislature of the State of New York, when it granted to the defendant the power to make suitable regulations, was itself without power to grant to this university the right to exercise any such power as it here attempts to exercise in pursuance of the terms of this regulation. The regulation as operative in the instant case creates an intolerable and unconscionable situation, and the action of the University under it is void because it is arbitrary, unreasonable, and in a high degree contravenes a true conception of sound public policy.

It is obvious that in certain aspects and with a proper application of it the rule has in it salutary features. Usually a student would know the reason for his dismissal and whether the dismissal was based upon appropriate facts, and it may be wise that in the first instance the University should not be called upon to make a statement of the reasons why the dismissal is proposed to be made. In so far, the rule is salutary, and no doubt that is the usual result; but when, as in this instance, a student demands to know the reason why, thereby challenging the existence of any grounds for the claim that he has failed to safeguard " ideals of scholarship " and " moral atmosphere " of the institution, and asks to be given an opportunity to state his side of the case, if there be a case against him, before he is deprived of valuable rights, that student is entitled to the elementary right of notice and opportunity to be heard. This element of notice lies at the very basis of the right of condemnation of property; and much more inherently does it lie at the basis of what is tantamount to an impairment of reputation. Given that opportunity, in the presence of admitted or established facts, the court would hesitate long before it would interfere with the discretion of the University; but here we have no facts, nothing but a dismissal " in order to safeguard those ideals of scholarship and that moral atmosphere which are in the very purpose " of the founding of the University. The position taken by the defendant is fraught with such obvious perils that it seems unnecessary to recite them; but what a field for rumor, for malice, for prejudice, for falsehood to roam in, leading to conduct on the part of the University which might be entirely honest but at the same time based upon a total lack or misapprehension of facts!

When the plaintiff demanded the reason for her dismissal and thereby an opportunity to be heard, and when she brought this action for reinstatement, her conduct was a challenge to the defendant to state, privately and publicly, the reasons therefor; the challenge was not accepted; she was entitled to know wherein her conduct was claimed to have been detrimental to " those ideals of scholarship and that moral atmosphere which are in the very

Supreme Court, August, 1927. [Vol. 130

purpose" of the founding of the University, and, until the reasons for the proposed action are stated and she has been given an opportunity to be heard in respect thereof, the defendant ought not to have nor has it the power of dismissal.

Whether or not the University actually had meritorious grounds for dismissal of the plaintiff is a question not involved herein. The case was tried upon the theory, on the part of the defendant, that no grounds had to be given, and certainly there was no evidence presented to the court of any ground justifying dismissal. If there were grounds claimed to exist, the plaintiff was entitled, upon demand, to know what they were, and to an opportunity to answer. While the defendant has great discretionary powers of action affecting its students in order to maintain the discipline and standing of the institution, there can be no basis for the exercise of discretion without the presence of facts calling its exercise into play. The wide discretionary powers lodged in the University are the negation of any warrant for arbitrary action. Arbitrary action is never the result of the exercise of discretion, and the University has no arbitrary but rather only a discretionary power to dismiss a student. The rule as interpreted by the defendant in the present instance cannot stand.

Although at all times, from the time of her admission to her dismissal from the University, the plaintiff was an infant, the question of infancy has not been raised on either side and, therefore, is not considered as in any wise affecting the views herein expressed.

The question of waiver has not been raised, for the reason that it has been argued that the provision under consideration was a part of the contract. The right to reputation is an inalienable right, like the right to life, liberty and the pursuit of happiness; it would be against sound public policy and public morals for one to be permitted to waive such a right and to endow another with the power to impair his reputation; and this irrespective of the question of infancy. Parental authority could scarcely go so far in waiving such a right of an infant. Such an inalienable right may not legally be waived.

Where no rule of law or principle of public policy is concerned, the parties may by contract make a law for themselves. (*Kneettle* v. *Newcomb*, 22 N. Y. 249.) In the cited case, however, it was held that one might not waive his right to the exemption of certain property from execution because such act would contravene sound public policy. If one cannot waive this statutory exemption, much less should he be permitted to waive a much more valuable right and one which is classed as an inalienable right.

Even if the contract as interpreted by the defendant could be

held to be valid, the rule of constructive knowledge does not I think have application here. The circumstances surrounding the inception of the contract were not unusual in this University; a matriculation card was picked up by the plaintiff and as a matter of course signed without any actual knowledge or appreciation of its legal effect or its consequences, but rather in full faith that the University would not call upon its prospective students to sign an agreement to abide by unreasonable rules or the arbitrary enforcement thereof. The infancy of the plaintiff at the time, while not urged, does not weaken her position or strengthen that of the defendant in suffering her signature to a card which on its face bound her by a rule which strikes the conscience as unjust, unrighteous and intolerable.

It is well said in 6 Ruling Case Law (at p. 626): " Where the contract contains an extraordinary provision, one which, as a matter of law, renders the contract obnoxious to every sense of fairness, honesty, and right, and is such as to make its enforcement clearly unconscionable, the court is justified in believing that the parties sought to be charged did not know of the presence of such provision, or did not have any comprehension of its significance. Where it is perfectly plain that one party has overreached the other, and has gained an unjust and undeserved advantage which it would be inequitable and unrighteous to permit him to enforce, a court of equity should not hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness. It is not the function of courts to make contracts for parties, or to relieve them from the effects of bad bargains. But where the simplicity and credulity of people are taken advantage of by the shrewdness, overreaching, and misrepresentation of those with whom they are dealing, and they are thereby induced to do unwittingly something the effect of which they do not intend, foresee, or comprehend, and which if permitted to culminate, would be shocking to equity and good conscience, a court of equity may with propriety interpose." The rule as applied in practice in the instant case brings it within that class so forcefully condemned by the foregoing citation.

The condemnation of the application of the rule as unreasonable and arbitrary in the instant case does not defeat the contract as a whole, the pursuance of the purposes of which has continued for a period of three years. In no event was this provision of the essence of the contract as hereinbefore stated, and the invalidity of its application does not defeat the duty on the part of the defendant to perform its part of that essence.

The plaintiff is entitled to judgment directing her reinstatement

in the University, as prayed for, together with the costs of the action. Plaintiff will prepare suitable findings of fact and conclusions of law in accordance herewith, to be agreed upon, or, if not agreed upon, to be settled upon two days' notice.

Judgment is ordered accordingly.